CONTINENTAL CAN CO., Inc..
v.
LASSITER PRESS, Inc.
Civ. A. No. 812.

United States District Court,
W. D. North Carolina,
Charlotte Division.

April 1, 1954.

Fred S. Lockwood, Franklin M. Warden, Cromwell, Greist & Warden, Chicago, Ill., Robert J. Hall, Mount Vernon, Ohio, Frank W. Snepp, Jr., McDougle, Ervin, Horack & Snepp, Charlotte, N. C., for plaintiff.

Warley L. Parrott, Channing L. Richards, Parrott, Richards & Sims, Charlotte, N. C., Robert Lassiter, Jr., Lassiter, Moore & Van Allen, Charlotte, N. C., for defendant.

WARLICK, District Judge.

This is a patent suit, originally instituted by Shellmar Products Corporation, a company incorporated under the laws of Delaware, but with its principal place of business at Mount Vernon, Ohio. The patent involved is one that issued to Irving Gurwick, being numbered 2,129,-929, entitled "Improvement in Lamination". It was assigned by Gurwick to plaintiff's predecessor in title, Shellmar Products Company. After the hearing, but before final argument and on November 4, 1953, Continental Can Company, Inc., became the owner of the patent and all of its rights and is now sole plaintiff. Application for such patent was filed on August 21, 1935, and ultimately on many hearings being had, and many claims disallowed, issued on September 13, 1938.

This action as filed charges defendant with infringement of claims, 2–3, 8–9–10–13 and 14.

The defendant, a North Carolina corporation, with its place of business at Charlotte in the Western District of North Carolina, is principally engaged in printing and allied business, and among its many activities, manufactures laminated wrappers for hosiery box tops, and work of that character, and therein lies the subject of this controversy. Since the institution of this action the corporate name of defendant has been changed to that of Lassiter Corporation.

The defendant denies infringement and asserts as a further defense the invalidity of the patent as issued.

The patent application discloses the mechanical device used for such lamination process as,

"In general the construction of this device follows closely the construction of the intaglio printing device disclosed in my co-pending application, Serial No. 682,923, filed July 31, 1933, and issued to Gurwick as Patent No. 2,024,354, on December 17, 1935." This patent has now expired.

A copy of one of the exhibits of this machine as described and used in furtherance of the patent is attached to these findings and conclusions so that it may be more properly understood.

This Gurwick patent is directed to the manufacture of laminated wrapping materials from transparent cellulose sheeting which is first printed on the underside with a multi-colored design and then given an over-all deposit, also on the underside, of a laminating adhesive by which it is laminated to a web of dissimilar material such as paper. The transparent cellulose sheeting used is by

itself a thin, flimsy material which is easily torn. The paper used in making the lamination is ordinary plain paper.

According to the process of the Gurwick patent, a roll of plain transparent cellulose sheeting is unwound and continuously fed into a combined printing and laminating machine. The transparent cellulose sheeting is first printed on its underface with a quick-drying intaglio design by passing the same through one or more intaglio printing units, depending upon the number of colors to be applied. Following the application of each color, the intaglio or rotogravure ink is dried or set through evaporation of the volatile solvent before the traveling web of transparent cellulose sheeting enters the next printing unit. After the sheeting or web passes through the last color printing unit and the ink has set or dried, the web enters a final printing unit in which an over-all deposit of adhesive ink or laminating agent is applied to the underside of the transparent sheeting by means of an engraved cylinder or roll having a continuous multi-cellular surface which extends completely around the cylinder or roll and from end to end thereof. The laminating agent is deposited over both the printed and unprinted areas. After application, the laminating agent dries rapidly to a tacky condition by evaporation of volatile solvent and a web of paper, which is unwound from a supply roll, is brought into face-to-face contact with the tacky underface of the traveling web of transparent cellulose sheeting and combined or laminated therewith into a composite sheet.

The intaglio or rotogravure inks disclosed by Gurwick for printing the multi-colored design on the underface of the traveling web of transparent cellulose sheeting are lacquer inks, and as such they dry rapidly by the loss of volatile solvent. The adhesive inks or laminating agents used in the final printing unit to lay down the over-all deposit of adhesive onto the underside of the printed cellulose film are similar to the intaglio inks used in the preceding print-

ing units being applied in the same manner and containing the same or equivalent ingredients.

The applicator cylinder, or roll, in the last printing unit for applying the laminating agent to the underside of the film has a multi-cellular surface which may be formed by chemical or mechanical engraving. This cylinder rotates in a vat containing the adhesive which it picks up on its multi-cellular surface. A doctor knife or blade removes excess adhesive from the surface of the cylinder and leaves behind in the cellular structure of the surface an accurately metered amount of the adhesive. The adhesive ink is transferred to the transparent film out of the cells or depressions of the cylinder surface, the same as the inks used for printing the design, and it is likewise deposited on the undersurface of the traveling transparent web.

The patent application additionally states that "any suitable type of ink may be employed for this purpose. For example, the usual intaglio printing inks may be employed in the printing units. For instance, the lacquer inks of the type specified in my color-on-color patent, No. 1,867,314, may be employed", and in further describing his patent for lamination in the application therefor, Gurwick sets out that "customarily webs òf cellulose acetate and paper are brought together under high pressure, a suitable adhesive being employed between the materials to produce a bond", and describes among other things, very fully the chemical formula for a proper and suitable composition for the lacquer ink for lamination.

|  | Per cent by volume |
|---|---|
| Ester gum solution | 60½ |
| Titanium dioxide solution | 15 |
| Tricresyl phosphate | 8 |
| Nitrocellulose solution | 7½ |
| Ethyl cellulose solution | 3½ |
| Methyl isobutyl ketone | 5½ |

and incidentally observes "that the formula specified over and for use in the last color is substantially the same as

the formula employed in lacquer inks such as used in units A and B".

It would thus appear that when all of the factors involved in this action have been thoroughly gone into, that the patent of plaintiff is narrowed down to the chemical compounds that go to make up the laminating properties, the rolls of paper used and their proper station on the machine, and the etched intaglio cylinder or roll with a multi-cellular surface as is used by plaintiff. At most it rises to no greater heights and validity and infringement must be determined on that level.

This whole controversy resolves itself around defendant's alleged infringing product which consists of laminating cellulose acetate to paper by means of a suitable adhesive under pressure in accordance with customary procedure as disclosed in a prior art.

Defendant began to manufacture its laminated box wrappers sometime in 1949 but only finished a part of the necessary operation to a completed product in its plant at Charlotte, and then forwarded it to a concern in New York City who finished it by laminating cellulose and acetate on the printed surfaces. Early in that year the defendant ordered a machine built for its use which would laminate box wrappers in one simple operation at its Charlotte plant,—after having determined upon an adhesive substance which it was advised would act as a necessary laminating product, and thereupon through its manufacture of articles thereon brought about this action. A copy of an exhibit of defendant's operating device is attached hereto for information. Some difference in appearance with the machine of plaintiff is easily observed, and a great deal of structural difference appears, which though it may lead in its operation to the same end,—a finished product, does so in a considerably different operation, and with a vast difference in the materials used. In producing its product defendant does not use a so-called printing ink for lamination but on the contrary, as the evidence discloses, uses an adhesive that is not an ink and cannot in anywise be so classified. It is entirely different from the inks or substances used in the first two operations on the machine and is in no-wise dependent upon the inks in the first two wells for the final lamination of the cellulose acetate to the paper. It is a synthetic rubber resin adhesive composition that is extremely tacky and seemingly will remain so even after being dried in the air for an appreciable length of time. It consists of the copolymer acrylonitrile type which is made thermoplastic with a hundred percent phenolicresin. It is plasticized with tricresyl phosphate. The solvents used are toluol and methylethyl ketone, and a fair conclusion is that it varies in a large measure from the formula disclosed in the patent application.

The cylinder or printing roll which obviously plays an important part in the defendant's operation is likewise an entirely different sort of appliance than that used by plaintiff as defined in the patent,—in that defendant uses what is referred to in the evidence as a knurled cylinder that has been crushed out, with diagonal lines, and having a distinctly grooved surface and with no crossing lines and therefore could not produce a multi-cellular deposit. It consists of a series of parallel lines which cut the cylinder at an approximate angle of 45 degrees across the cylinder. It contains no dots or depressions or wells, which could be formed by either cross lines or otherwise on its surface.

Assuming, but not deciding, the validity of the patent, one finds from the facts as disclosed, by the record, that at most plaintiff has a formula for lamination and an etched roll and in the use thereof brings into being its finished product, and as such is entitled to protection against any infringement. The defendant produces a comparable object but in a greatly different manner. Its formula for lamination from reputable evidence is largely a different chemical product. The cylinder on which its lamination is brought about is in nowise comparable to that used by the plaintiff.

748

I therefore conclude as a matter of law, that,

The Court has jurisdiction.

The Gurwick patent, 2,129,929, does not cover any of the methods or the means of printing which constitute the first two processes involved, but is wholly limited to the laminating process with the inks described in the patent. Hence, the claims alleged are not infringed by the defendant's method of producing the product which it brings about. Having thus found, defendant is awarded judgment which will be signed upon presentation.